# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ROBERT B. DEAL,

      Plaintiff,

v.                                          CV 05-1187 WPL

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

## MEMORANDUM OPINION AND ORDER

Robert B. Deal brought this action seeking judicial review of the denial of his claim for disability insurance benefits. The matter is before me now on the administrative record (AR), Deal's motion and memorandum to reverse or remand, the response of the Commissioner of Social Security, and Deal's reply. For the reasons that follow, I will deny the motion.

### STANDARD OF REVIEW AND SEQUENTIAL EVALUATION PROCESS

In reviewing the ALJ's decision, I must determine whether he applied the correct legal standards and whether his factual findings are supported by substantial evidence in the record. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Id*. I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the ALJ. *See id.*

The Social Security Administration has promulgated a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 404.1520.

At the first four steps, the claimant must show that he is not working at a substantial gainful activity, that he has an impairment that is severe enough to significantly limit his ability to do basic work activities, and either that the impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or that he is unable to perform the work he has done in the past. At the fifth step, the Commissioner must show that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Barnhart*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL AND PROCEDURAL BACKGROUND

Deal applied for disability insurance benefits in 2003, claiming that he was disabled as of September 30, 1992—the date his insured status expired. (AR 14-15.) He was born in 1946, has a high school education, and was in the United States Navy from 1966 to 1970. (*Id.* at 15, 21, 203.) Deal worked for a railroad for over eight years. (*Id.* at 212-13.) In August 1983, he injured his back and fractured his right leg and ankle when he fell off a ramp while working for the railroad. (*Id.* at 90, 93, 213.) As a result of that injury, he began receiving Social Security benefits in 1984. In 1987, his benefits were terminated, and Deal did not appeal the termination. (*Id.* 56, 213-14.) He apparently never returned to work after the 1983 accident. (*Id.* at 120.)

### *Testimony*

Deal testified that since the termination of his benefits, his condition has gradually worsened. (*Id.* at 214.) He did not appeal the termination of his benefits because he did not know that he could. (*Id.*) He testified that in December 1991, his wife had a baby that they gave up for adoption because he was unable to lift the baby or otherwise care for him. His wife could not care for the baby because

she worked outside the home.  (*Id.* at 216-17.)

Deal started having problems with his heart before the baby was born.  (*Id.* at 222-23.)  He continues to have chest pains "from time to time" and he carries nitroglycerin with him.  (*Id.* at 222.)  He stated that he has had back pain "24/7" since the time the baby was born.  (*Id.* at 218-19.)  He needs to lie down at least three or four times a day because of the pain.  (*Id.* at 219.)  His back pain also interferes with sitting for long periods of time.  (*Id.* at 220.)  Additionally, Deal testified that his hand was wounded by shrapnel while he was serving in the Navy in Vietnam and that his "ankles hurt a lot."  (*Id.* at 215, 223.)

Deal believes he was diagnosed with diabetes in August 1992.  (*Id.* at 216.)  Before August 1992, he experienced headaches, blurred vision, and thirstiness, which he attributes to the diabetes.  (*Id.* at 220.)  Since 1991, he has had headaches "[p]retty much weekly."  The headaches interfere with his ability to concentrate.  (*Id.* at 221.)  Since the time he was diagnosed with diabetes, Deal has had problems with numbness and swelling in his legs.  He was not sure if the numbness was caused by the diabetes or by his back problem.  (*Id.* at 221-22.)  At the time of the hearing he had been receiving a veterans' disability pension for a few years because his diabetes was connected to his exposure to Agent Orange.  (*Id.* at 215.)

Deal testified that he does not do "a lot" throughout the day.  (*Id.* at 224.)  He can only stand for about the length of time required to take a short shower.  (*Id.* at 225.)  After that, he has to sit or lie down.  (*Id.*)  He can help his wife with cooking for about fifteen or twenty minutes before needing to rest.  (*Id.* at 224.)  He spends time talking on a ham radio.  (*Id.*)

Deal's wife corroborated his testimony that his condition has gotten worse since the termination of his benefits.  (*Id.* at 228.)  She also confirmed that one of the reasons they gave up the

baby was because Deal could not lift or care for him.  (*Id.*)  She stated that before Deal was diagnosed with diabetes, his symptoms were thirstiness and blurred vision and "[t]hat's about it." (*Id.* at 229.)  She testified that although Deal has to sit down after about ten or fifteen minutes of helping her with the cooking, he can continue to help her after sitting down.  (*Id.* at 230.)

### Medical Evidence

#### Back Problem

A medical record from March 1984 indicates that Deal had back spasms and pain resulting from the 1983 accident.  (*Id.* at 93-95.)  However, a CT scan revealed only "a very slight degree of retrospondylolisthesis at L3-4 [and] [m]ildly narrowed lateral recesses at L4-5 without definite compression of the traversing L5 nerve roots." (*Id.* at 97.) There was no evidence of disc herniation, scoliosis, or spinal stenosis.  (*Id.*)

A medical record from November 1984 states that Deal had a full range of motion in his back, normal ability for straight-leg raising, normal reflexes, no atrophy or weakness, and no apparent muscle spasms. (*Id.* at 104.)  X-rays of the lumbosacral spine were normal, showing well-maintained disc space heights and satisfactory alignment.  (*Id.*)  The doctor opined that Deal had a back sprain that was aggravated by his weight of 210 pounds.  (*Id.*)

An August 2000 medical record indicates that Deal had degenerative changes in the lumbar spine at multiple levels and possible spondylolysis.  (*Id.* at 117.)  A July 2002 MRI revealed "[v]ery severe spinal stenosis at L4-5 secondary to grade I spondylolisthesis, extremely severe facet arthropathy, ligamentum flavum hypertrophy, disc bulge, and some epidural fat.  There is mild/moderate bilateral neural foraminal narrowing, not definitely compressing the exiting L4 nerve roots." (*Id.* at 139.)  A surgical fusion was planned, but was apparently never performed.  (*Id.* at

135-36.)  A note in an August 2003 medical record indicates that Deal had experienced back pain for a year and a half.  (*Id.* at 138.)

### Ankle Problem

As a result of the 1983 accident, Deal was still experiencing pain and restricted motion in his right ankle during the November 1984 examination.  The doctor believed the pain was caused by bone fragments, apparently resulting from the fractures he sustained in the accident.  (*Id.* at 104.)  The fragments were surgically removed in January 1985.  (*Id.* at 107.)

### Heart Problem

A November 1993 spect myocardial perfusion indicated that Deal had "small inferior MI with mild peri-infarct reversible ischemia."  (*Id.* at 145.)  Another spect myocardial perfusion was performed in August 1998.  The report from this test states that although the prior test "indicated there was a small inferior MI[,] this is not definitely seen at the present time."  (*Id.* at 144-45.)  No large areas of ischemia were identified, but it appeared that "small vessel disease" may have been present.  (*Id.* at 145.)

According to an August 2001 medical record, Deal reported no cardiac symptoms, but noted that he "occasionally gets chest pain which has been diagnosed as costochondritis."  The record states that although Deal carried nitroglycerin with him, he had not yet used it.  (*Id.* at 206.)

A July 2002 medical record states that Deal's file from the Veterans Administration shows that he had a history of chest pain since 1989.  (*Id.* at 127.)  The "diagnosed etiology" of the chest pain was costochondritis, which Deal reportedly had for ten to fifteen years.  (*Id.* at 128.)  The medical record indicates that Deal told the doctor that he was a "house husband."  He did the housework and grocery shopping.  He also took care of his property, which included fifty chickens

and previously included a goat herd. (*Id.*) The doctor estimated that Deal's "METS" was "7 to 8 for activity, considering the description of his activities at home." (*Id.*)[1]

### *Hand Problem*

A February 2000 medical record indicates that Deal visited the doctor complaining of pain in his right thumb for three weeks. (*Id.* at 118.) The record notes degenerative changes in the metacarpophalengeal joint of the thumb that could be secondary to old or chronic trauma. (*Id.*) A January 2001 medical record states that Deal reported constant pain in his right hand. (*Id.* at 120.) The doctor diagnosed him as having "[s]ignificant post traumatic degenerative joint disease . . . at the first metacarpophalangeal joint-symptomatic with limited range of motion," "[s]ignificant degenerative joint disease of the second and third metacarpal-phalangeal joints and of all the interphalangeal joints of the right hand-symptomatic," and [r]adiological evidence of an old ununited fracture of the ulnar styloid, mild degenerative joint disease of the navicular joint and first carpometacarpal joints of the right wrist." (*Id.* at 121.)

### *Diabetes*

The medical records indicate that Deal was diagnosed with diabetes in 1992 or 1993, but that there are no restrictions on his activities related to his diabetes. (*Id.* at 129-30, 159.)

### **ALJ's Decision**

Applying the sequential evaluation process, the ALJ first concluded that Deal had not engaged in substantial gainful activity since his alleged onset date. (*Id.* at 15.) Next, he determined that Deal

---

[1] "MET" means "metabolic equivalent level." As the ALJ noted, the CDC describes a MET of 7-8 as "vigorous activity." (AR 16); *see* http://www.cdc.gov/nccdphp/dnpa/physical/pdf/PA_Intensity_ table_ 2_1.pdf.

did not have a medically determinable impairment related to heart disease or diabetes before the expiration of his insured status. (*Id.* at 16.)

The ALJ noted that the first medical evidence regarding heart disease was the August 1993 spect myocardial perfusion test, which was twelve months after Deal's insured status expired. Furthermore, the August 2001 medical record indicated that Deal did not have any chest pain, that his prior chest pain had been diagnosed as costochondritis, and that he did not need to use nitroglycerin. (*Id.*)

Regarding diabetes, the ALJ stated that Deal had no significant symptoms of this disease before the expiration of his insured status. (*Id.*) He also referred to statements in various medical records, indicating that Deal was quite active. For example, the September 1996 medical record stated that Deal claimed to be walking three miles a day and the September 2001 medical record stated that Deal did not report any restrictions on his activities and that he "had been advised to increase his physical activity." (*Id.*) The ALJ also referred to the July 2002 medical record, which described Deal's house husband duties, and noted that the CDC defines METs of 7-8 as vigorous activity. (*Id.*)

Returning to the sequential evaluation process, the ALJ concluded that Deal's obesity and his back, ankle, and hand problems were severe impairments, but not severe enough to meet or equal a listed impairment. (*Id.* at 17.) The ALJ pointed out that the last medical evidence regarding the back and ankle problems, before the expiration of Deal's insured status, was in February 1985. After that date, Deal did not seek treatment for back pain until 2000. (*Id.*) Regarding the hand problem, the ALJ acknowledged that this injury occurred well before 1992, but noted that Deal did not report any pain or limitation resulting from it until 2000. (*Id.* at 19.)

The ALJ next decided that Deal retained the residual functional capacity to perform light work. (*Id.* at 20.)  The ALJ based this decision on his assessment of Deal's credibility and on the lack of any substantial restriction on Deal's daily activities as of his date last insured.  The ALJ commented that the medical evidence did not corroborate Deal's level of pain and limited function until 2001. He also referred to the note in the August 2003 medical record, stating that Deal's back pain had only been a problem for one and a half years, and to the medical notes about Deal's house husband duties and his walking three miles a day.  (*Id.*)  The ALJ concluded that these activities are consistent with the standing and walking requirements of light work.  (*Id.*)

The ALJ concluded that Deal had no past relevant work experience.  Therefore, at the fifth step of the sequential evaluation process, the Commissioner had the burden of showing that there were jobs existing in significant numbers in the national economy that Deal could perform.  (*Id.* at 21.)  Because Deal could perform the full range of light work, the ALJ concluded that a finding of "not disabled" was required under the grids.  (*Id.* at 22).

## DISCUSSION OF DEAL'S ARGUMENTS

Deal attacks the ALJ's decision on three grounds.  First, he argues that the decision is not supported by substantial evidence.  Second, he argues that the ALJ erred in finding that his testimony was not credible.  Third, he argues that the ALJ erred by failing to order a consultative examination.

### *Substantial Evidence*

Because Deal's insured status expired on September 30, 1992, he must establish that he was disabled before that date.  *Miller v. Chater*, 99 F.3d 972, 975 (10th Cir. 1996).

Deal emphasizes that he was found to be disabled in the 1980s and that both he and his wife testified that his condition has not improved since that time.  What Deal ignores is that his disability

benefits were terminated in 1987.[2]  Thus, the fact that he was considered to be disabled from 1984 to 1987 is not dispositive of his claim for benefits after that period.

Deal also criticizes the ALJ for determining that there was no medical evidence regarding diabetes or cardiac problems before the date his insured status expired.  Regarding diabetes in particular, he asserts that because he was discharged from the military in 1969 and the diabetes is service-related, "it is difficult to conclude [he] did not have diabetes prior to September 30, 1992." (Doc. 14 at 9.)

To qualify for disability benefits, Deal was required to show that he was under a "disability," which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423(d).  To establish a medically determinable impairment Deal was required to present "medical evidence consisting of signs, symptoms, and laboratory findings." 20 C.F.R. § 404.1508.  "Signs" are anatomical or physiological abnormalities that are shown by medically acceptable clinical diagnostic techniques. *Id.* § 1528(b).  Similarly, "laboratory findings" are anatomical or physiological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques.  *Id.* § 1528(c).  Lay testimony, including Deal's own testimony about his symptoms, is insufficient to establish a medically determinable impairment.  *See id.* §§ 404.1508, 1513(a), 1528(a).

The ALJ correctly noted that there simply is no medical evidence that Deal suffered from diabetes or cardiac problems before his insured status expired.  Regarding diabetes, Deal's medical

---

[2] It appears that the benefits were terminated because the Commissioner determined that he was no longer disabled.  Deal testified, "They sent me a letter that I was supposed to be examined by one of their doctors.  I went to see him, and shortly after that, they sent me a letter that I was not going to receive any more help from Social Security, you know."  (AR 214.)

records merely indicate that Deal stated that he was diagnosed with diabetes sometime in 1992 or 1993. Regarding cardiac problems, the first medical evidence in the record is from over one year after the date Deal's insured status expired.[3]

Next, Deal accuses the ALJ of "cherry picking" evidence out of context to support his determination that Deal was not disabled.  He argues that the evidence cited by the ALJ is overwhelmed by other evidence tending to show that he was disabled as of September 30, 1992.

Regarding his back problem, Deal points to medical records, stating that he had constant backaches in October 1983 and was not capable of working in March 1984.  This evidence relates to the period immediately following Deal's August 1983 accident, which resulted in his receiving disability benefits until 1987.  The ALJ acknowledged that Deal had back problems during that period, but observed that the medical evidence regarding his back condition at that time indicated only mild degenerative changes that did not result in functional limitations that precluded all work activity. (AR 17-18.)  Moreover, the ALJ noted that Deal did not seek any treatment for back pain between 1985 and 2000.  (*Id.* at 17.)  Deal also points to the July 2002 MRI, which showed severe spinal stenosis and other spinal problems.  The ALJ cited this MRI, but emphasized that it did not relate to the period under consideration.  (*Id.* at 17-18.)

Deal also points out the evidence of his hand injury, particularly the January 2001 report that showed significant post-traumatic degenerative joint disease.  The ALJ acknowledged that Deal had problems with his hand arising from an injury that occurred well before the expiration of his insured

---

[3] Deal's medical records indicate that his chest pain had been diagnosed as costochondritis before his insured status expired, but there is no medical evidence of this diagnosis. Moreover, costochondritis is not a cardiac condition. *See* STEDMAN'S MEDICAL DICTIONARY 417-18 (27th ed. 2000) (describing costochondritis as an inflammation of rib cartilage).

status. But he also recognized that Deal did not complain of, or seek treatment for, any pain arising from the injury until 2000, which was well after the expiration of his insured status. (AR 19.) I further note that Deal's application for benefits did not list any problem with his hand (*id.* at 62), nor did he testify to any pain or functional limitations in his hand.

### *Credibility*

Judging credibility is "peculiarly the province" of the ALJ. *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). Nevertheless, a credibility determination must be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of a finding. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).

Here, the ALJ cited evidence to support his finding that Deal was not credible. Specifically, he first noted that Deal's allegations of symptoms and functional limitations were not consistent with the medical evidence before 2001. (AR at 20.) This is accurate. The record reflects that Deal did not seek treatment for his back, ankle, and hand problems between 1987 and 1992. The ALJ also noted that a medical record from August 2003 indicated that Deal stated that he had only been experiencing back pain for one and a half years. (*Id.*); *see Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993) (listing the frequency of medical contacts and the consistency of nonmedical testimony with objective medical evidence as factors for an ALJ to consider in determining the credibility of subjective allegations of pain).

Additionally, the ALJ observed that Deal's daily activities were not substantially restricted before his insured status expired. The ALJ relied on Deal's 1996 statement that he was walking three miles a day and his 2002 description of his house husband duties. The ALJ believed that the fact that Deal could perform these activities after his insured status expired suggested that he also was likely

able to perform them before 1992, especially given the lack of medical evidence during the insured period. (*Id.*); *see Thompson*, 987 F.2d at 1489 (listing daily activities as a factor for an ALJ to consider in determining the credibility of subjective allegations of pain).

Deal argues he was credible because there is evidence that he did not exaggerate his conditions when given the opportunity to do so. He points to medical records reflecting that he corrected a report stating that the shrapnel wound was in his head rather than his hand and that he denied experiencing certain complications that could arise from diabetes. As the Commissioner notes, a claimant has different incentives when he describes his condition for the purpose of obtaining benefits and when he describes his condition for the purpose of obtaining treatment.

### *Consultative Examination*

Deal argues that the ALJ should have obtained a consultative examination to determine when his alleged current disabled state began.

The ALJ has broad latitude in deciding whether to order a consultative examination. *Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997). The Tenth Circuit has held that "the ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability." *Id.* at 1169. However:

> [W]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present [the] claimant's case in a way that the claimant's claims are adequately explored. Thus, in a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development. In the absence of such a request by counsel, we will not impose a duty on the ALJ to order a consultative examination unless the need for one is clearly established in the record.

*Id.* at 1167-68 (citation omitted).

12

Although Deal was represented by counsel at the administrative level, counsel did not request a consultative examination. Moreover, Deal does not explain how a retrospective medical assessment conducted well after the period at issue would have been of material assistance. *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1348-49 (10th Cir. 1990); *see also Miller v. Barnhart*, 175 F. App'x 952, 957 (10th Cir. 2006).[4]

CONCLUSION

After a meticulous review of the entire administrative record, I conclude that the ALJ applied the correct legal standards and that his factual findings are supported by substantial evidence. Therefore, Deal's motion to reverse or remand (Doc. 13) is denied.

IT IS SO ORDERED.

_____
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

---

[4] The Commissioner defends the ALJ's decision not to order a consultative examination by asserting that an ALJ need not consult a medical advisor unless the onset of a disability must be inferred. But because Deal does not argue that the ALJ should have consulted a medical advisor, that issue is not properly before me. Furthermore, the ALJ was not required to consult a medical advisor because there has been no finding that Deal is currently disabled. *See, e.g., Blea v. Barnhart*, ___ F.3d ___, 2006 WL 3001173 (10th Cir. Oct. 23, 2006).